# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-1590


**LOUISIANA ALLIGATOR WHOLESALE, INC.**

**VERSUS**

**PRAIRIE CAJUN SEAFOOD WHOLESALE DISTRIBUTORS, INC.**


************

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-17201
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Sylvia R. Cooks, Oswald A. Decuir, and Michael G. Sullivan, Judges.


**AFFIRMED AS AMENDED.**

Merrick J. (Rick) Norman, Jr.
Norman Business Law Center
145 East Street
Lake Charles, Louisiana  70601
(337) 436-7787
Counsel for Plaintiff/Appellee:
       Louisiana Alligator Wholesale, Inc.

James H. Mixon
Attorney at Law
Post Office Box 83
Bunkie, Louisiana  71322
(318) 346-6616
Counsel for Defendant/Appellant:
       Prairie Cajun Seafood Wholesale Distributors, Inc.

**SULLIVAN, Judge.**

Prairie Cajun Seafood Wholesale Distributors, Inc. (Prairie Cajun) appeals a judgment in favor of Louisiana Alligator Wholesale, Inc. (Louisiana Alligator) for the loss of alligator meat Prairie Cajun was to process for Louisiana Alligator during the 2002 alligator season. Louisiana Alligator answered the appeal and seeks modification of the trial court's judgment. For the following reasons, we amend and affirm as amended.

### *Facts*

Louisiana Alligator farms alligators and also buys alligators from hunters during the alligator hunting seasons established by the State of Louisiana. It skins the alligators then has the carcasses deboned and defatted for the meat which is packaged and frozen for sale to third parties. It controls the harvest of its farmed alligators; therefore, the volume of farmed alligators to be processed at any one time is regulated. However, during the hunting seasons, most of the hunters catch their limit in the first seven to ten days of the season, resulting in a large number of alligators having to be processed in a short period of time.

Prior to the 2002 hunting season, Prairie Cajun had processed farmed alligators for Louisiana Alligator. Louisiana Alligator and Prairie Cajun contracted for Prairie Cajun to process alligators for Louisiana Alligator during the 2002 hunting season at a cost of $.75 per pound. In August and September 2002, Louisiana Alligator sent 250,000 pounds of alligator carcasses to Prairie Cajun for processing. Tommy Stoddard, owner and operator of Louisiana Alligator, testified that shortly after the carcasses were delivered to Prairie Cajun, he was contacted and informed that its processing of the meat was behind due to equipment problems. Mr. Stoddard also

1

testified that he visited Prairie Cajun and discussed the problems with Jeff Derouen, an owner of Prairie Cajun. According to Mr. Stoddard, he told Mr. Derouen that if he had to let anything spoil, let the red meat spoil because it is less valuable than the white meat, and Mr. Derouen responded that if they let some spoil, "we'll pay for it."

Louisiana Alligator's 250,000 pounds of carcasses yielded 138,000 pounds of packaged meat. The packaged, frozen meat was shipped from Prairie Cajun to a cold storage facility in Lafayette. Mr. Stoddard negotiated to sell portions of the alligator meat to different parties. The meat was shipped from the cold storage facility to the purchasers. Thereafter, he received complaints from at least two purchasers that some or all of the meat they purchased was spoiled, and the meat was returned to Louisiana Alligator's cold storage facility.

Louisiana Alligator instituted this lawsuit to recoup losses it claims that it sustained as a result of the spoiled meat processed by Prairie Cajun. It also sought payment for 17,300 pounds of alligator claws which it contends Prairie Cajun bought from it, as well as attorney fees. Prairie Cajun filed a reconventional demand against Louisiana Alligator for its processing fee, storage fees, finance charges, and attorney fees.

The matter was tried on the merits. After taking the matter under advisement, the trial court rendered judgment in favor of Louisiana Alligator in the amount of $67,272.51 with interest from the date of judicial demand until paid. Prairie Cajun appealed the judgment assigning six errors. Louisiana Alligator answered the appeal, assigning three errors.

***Standard of Review***

In their assignments of error, the parties assert errors of fact and errors of law. Where a party contends that the trial court's ruling is incorrect due to an error of law, the appellate court must ascertain whether the ruling in question was legally correct. *Belaire v. Don Shetler Olds Buick Chevrolet*, 02-1152 (La.App. 3 Cir. 6/4/03), 847 So.2d 723.

A finding of fact by a trial court may not be set aside in the absence of manifest error or unless it is clearly wrong. *Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Sys. of Calcasieu, Inc.*, 99-201 (La. 10/19/99), 748 So.2d 417. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Id.* Where documents or objective evidence so contradicts the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). However, if such factors are not present, and a fact finder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. *Id.*

### Discussion

**Prairie Cajun's Claims**

***Liability***

The trial court's determination of liability in this case was based on its conclusion that Mr. Stoddard was more convincing than Prairie Cajun's witnesses. We have reviewed the record and find no manifest error with this conclusion. Prairie Cajun argues that Louisiana Alligator did not prove that its meat was damaged while in its possession and not after it left its possession. As explained by the trial court, Mr. Stoddard's testimony, which it accepted as more credible than Prairie Cajun's witnesses' testimony, established that Prairie Cajun's processing of Louisiana Alligator's carcasses was slowed due to mechanical problems with its equipment, which would allow the meat to spoil. Mr. Stoddard further testified that there was no indication there was any problem keeping the meat properly refrigerated after it left Prairie Cajun, and Prairie Cajun did not present any evidence to establish that the meat spoiled as a result of something other than its inability to process it in a timely manner.

***Reconventional Demand***

Prairie Cajun asserts that the trial court erred in finding that its reconventional demand against Louisiana Alligator was for $38,816.00, not the $97,556.89 stated in its demand. Louisiana Alligator correctly points out that this was not an error but a misstatement by the trial court which used the correct amount of $97,556.89 when it offset Louisiana Alligator's damages against Prairie Cajun's reconventional demand.

Prairie Cajun also urges that the trial court erred in disallowing charges for storage and interest. Having found no error with the trial court's conclusion that

4

Prairie Cajun is liable for the spoiled meat, we find no error with its conclusion that Prairie Cajun is not entitled to charge storage for the spoiled meat. Furthermore, Prairie Cajun added an amount for storage to its invoice *after* suit was filed.

Prairie Cajun next argues that it is usual and customary to charge 18% per annum interest for past due accounts but did not present any evidence that Louisiana Alligator contracted to pay interest. Therefore, we find no error with the trial court's disallowance of the claim for interest. *Bieber-Guillory v. Aswell*, 98-559 (La.App. 3 Cir. 12/30/98), 723 So.2d 1145.

### Dupuy's Gator House Meat

Prairie Cajun assigns as error the trial court's failure to give it credit for alligator meat returned in bags marked Dupuy's Gator House. The trial court was correct in its observation that portions of Louisiana Alligator's meat was repackaged by its customers for resale to their customers; however, Mr. Stoddard admitted that "four hundred and something pounds of marinated leg meat" of the 11,700 pound allotment which was returned was not processed by Prairie Cajun. Accordingly, we find the trial court erred in finding that Prairie Cajun was not entitled to a credit for meat packaged in Dupuy's Gator House bags.

Prairie Cajun contends that it is entitled to a credit for 597 pounds of meat packaged in Dupuy's Gator House bags. The trial court accepted Prairie Cajun's weights of returned meat, as Mr. Stoddard admitted that Louisiana Alligator did not weigh any returned meat. Therefore, we accept Prairie Cajun's weight of 597 pounds for the meat packaged in Dupuy's Gator House bags and reduce the trial court's award in favor of Louisiana Alligator by $1,940.25 (597 pounds × $3.25).

5

Prairie Cajun next complains that the trial court failed to give it credit for 917 pounds and 85 pounds of meat that it found to be good when it inspected the returned meat. The trial court's finding in favor of Louisiana Alligator is based upon its opinion that Mr. Stoddard was more credible than Prairie Cajun's witnesses. These meats were inspected by Prairie Cajun but not resold. Prairie Cajun did not question Mr. Stoddard about them. Prairie Cajun repackaged and sold meat that it determined was not spoiled. Because it would have benefitted Prairie Cajun to resell all returned meat that it determined was not spoiled, it is reasonable to assume that it would have sold these meats if they were not spoiled. For these reasons, we find no error with the trial court's failure to find these meats were not spoiled.

### Gained Profits Versus Lost Profits

Louisiana Alligator's primary customer for the meat processed by Prairie Cajun was All American Gator Company (All American). Shortly after purchasing from Louisiana Alligator, All American's owner, Bryan Woods, contacted Mr. Stoddard and reported that he had some "bad" meat. All American reprocesses the alligator meat it purchases by tenderizing and/or marinating and repackaging the meat in smaller portions for resale; therefore, it could cull bad meat from good meat before selling it to its customers. All American culled 5,000 pounds of the meat it purchased to salvage good meat.

Mr. Stoddard credited All American $.50 to $.75 per pound against its $3.25 purchase price for the extra work to salvage the good meat. However, he did not establish how many pounds he credited at $.50 and how many pounds he credited at $.75. The trial court awarded Louisiana Alligator $.75 per pound for lost profits on the 5,000 pounds. Prairie Cajun contends this was error. Because Louisiana

6

Alligator did not establish how many pounds it credited All American at $.75 per pound, we find that the trial court erred in awarding lost profits of $.75 per pound on all 5,000 pounds and reduce the award from $3,750.00 to $2,500.00 (5,000 × $.50).

Prairie Cajun next argues that because it was able to sell meat returned by All American which it determined was not spoiled for $3.95 per pound instead of $3.25 per pound, it should be awarded an offset against the amount of lost profits with these gained profits. The trial court noted in its reasons that Prairie Cajun had already credited Louisiana Alligator's account for this amount; therefore, it did not include that amount in its calculation of damages. This assignment is without merit, as Prairie Cajun has already received an offset for these gained profits.

### Red Meat

Louisiana Alligator also seeks reparation for 23,000 pounds of "red meat" that its customer, Catfish Wholesale, rejected because it was spoiled. Prairie Cajun contends the trial court erred in awarding recovery for this meat because it did not have the opportunity to inspect it after it was returned. Mr. Stoddard testified that Catfish Wholesale contacted him and told him that the meat was spoiled. He had Catfish Wholesale return the meat to Louisiana Alligator's cold storage. Mr. Stoddard testified that he randomly tested 2,000 to 3,000 pounds of the meat and that all the meat he tested was bad. He explained that he believed the entire 23,000 pounds was spoiled because when Mr. Derouen informed him that Prairie Cajun was getting behind in processing, he instructed Mr. Derouen to "[s]ave the white meat and let the red go." Accordingly, he "figured all of [the red meat] was bad because that was the last thing they got to."

7

We find no error with the trial court's conclusion that all the red meat spoiled. Prairie Cajun complains that it did not get to inspect the meat but does not contend that Louisiana Alligator denied a request to inspect the meat. In fact, Mr. Stoddard testified that he maintained the red meat in cold storage as of trial because of the litigation.

### *Prescription*

Prairie Cajun urges that the trial court erred in failing to find that Louisiana Alligator's claims against it had prescribed because it processed the meat in 2002 but suit was not filed against it until 2005. It argues that because there was no written contract the claims are governed by negligence and prescribed one year after it processed the meat. This argument has no merit because a contract need not be in writing unless required by law. La.Civ.Code art. 1927.

Prairie Cajun further argues that because Louisiana Alligator alleged in its petition that Prairie Cajun was negligent in the performance of its contract, its claim is in negligence not contract and subject to a one-year prescriptive period. In *Federal Insurance Co. v. Insurance Co. of North America*, 262 La. 509, 512, 263 So.2d 871, 872 (1972), the supreme court addressed this argument, explaining:

> It has been recognized by this Court on [numerous] occasions that when a party has been damaged by the conduct of another arising out of a [contractual] relationship, the former may have two remedies, a suit in contract, or an action in tort, and that he may elect to recover his damages in either of the two actions. In such cases, the prescription applicable is determined by the character which plaintiff gives his pleadings and the form of his action.

Louisiana Alligator's petition is based in contract. It alleged therein that it entered into a contract with Prairie Cajun and that it suffered damage as a result of

8

Prairie Cajun's "negligence and breach" for which it seeks a judgment "enforcing the contract" and damages. This assignment of error is without merit.

***Louisiana Alligator's Claims***

***Alligator Claws***

Louisiana Alligator assigns as error the trial court's finding that there was no sale to Prairie Cajun of the alligator claws on the carcasses it processed. Louisiana Alligator contends that Prairie Cajun bought the claws for $2.08 per pound. Mr. Stoddard testified that Mr. Derouen made a deal to sell the claws overseas. Mr. Derouen testified that Mr. Stoddard contacted him concerning someone from China who was interested in buying alligator claws and that Mr. Stoddard and the gentleman met at Prairie Cajun where they made a deal for the claws, but the deal could not be finalized because the market in China for claws closed due to a change in government regulations. Mr. Derouen further testified that he was able to smuggle one shipment of the claws into the country but no more due to market conditions.

Louisiana Alligator relies upon the deposition of Prairie Cajun's corporate representative to establish that it sold the claws to Prairie Cajun. While the representative answered "yes" to counsel's question as to whether there was an agreement that Prairie Cajun would buy the claws, he explained that he did not know what was "worked out between" Mr. Derouen and Mr. Stoddard. Mr. Stoddard testified on rebuttal but did not deny Mr. Derouen's account of what transpired with the claws. Therefore, we find no error with the trial court's conclusion that there was a joint venture between the parties to find a sale for the claws.

Louisiana Alligator alternatively contends that Prairie Cajun should bear one-half the loss, i.e., one-half the value of the claws. Mr. Derouen's undisputed

9

testimony was that after the Chinese government imposed new restrictions on the import of alligator claws there was no market for the claws. Accordingly, the trial court correctly found that the claws have no value, and there is no loss.

### *Depositary*

Louisiana Alligator asserted in its petition that Prairie Cajun was a depositary. The trial court disagreed; Louisiana Alligator claims this was error. In finding that Prairie Cajun was not a depositary, the trial court noted that prior to 2004, the Louisiana Civil Code articles dealing with depositary provided only for gratuitous depositary and correctly observed that substantive changes to laws cannot be applied retroactively. However, the trial court proceeded to determine that application of the general law of obligations to the facts of this case "produces a result not unlike that argued for" by Louisiana Alligator. We find no error with this conclusion. *See Laborde v. Roser's Cleaners, LLC*, 07-78 (La.App. 5 Cir. 5/15/07), 957 So.2d 865, *writ denied*, 07-1474 (La. 10/5/07), 964 So.2d 945.

### *Disposition*

For the reasons discussed herein, we amend the trial court's judgment by reducing its award in favor of Louisiana Alligator Wholesale, Inc. by $1,250.00 and $1,940.25; the judgment is affirmed in all other respects. Costs of this appeal are to be paid equally by the parties.

**AFFIRMED AS AMENDED.**